UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TINA M. QUINTILE | ) | Case No. 1:07CV2413 |
| | ) | |
| Plaintiffs, | ) | JUDGE JOHN R. ADAMS |
| vs. | ) | |
| | ) | [Resolving Doc. #23] |
| MEDINA COUNTY, et al., | ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendants. | ) | |

This matter is before the Court upon a motion for summary judgment filed by Defendants Medina County, Medina County Sheriff's Office ("MCSO"), David Baker, Neil Hassinger, and Dean Lesak (collectively "Defendants"). For the reasons stated herein, Defendants' motion is GRANTED.

**I. Facts**

Plaintiff Tina Quintile was hired by Defendant MCSO on August 28, 2000, and she eventually became a corrections officer. Prior to that time, she had worked in the jail as an employee for a firm contracted to clean the premises. Following conversations with Defendant Sheriff Neil Hassinger about her desire to be employed, Quintile completed the required education and applied for a position at MCSO. During her initial years of employment, Quintile had few if any disciplinary problems. However, as her time at her position increased, so did the number of disciplinary actions against her.

During the relevant period of time, Quintile was supervised by Defendant Dean Lesak and at times by Defendant David Baker. Quintile complains that these supervisors routinely treated her differently than male corrections officers in that she was disciplined for infractions that males committed and for which they were not disciplined.

The record herein resembles the complaint filed in this matter. It is scattered across numerous theories and Quintile rarely ties relevant facts to her alleged theories of recovery. However, to understand each of her causes of action, the Court lays out a detailed view of her time as an employee as it relates to this matter.

During her employment with Defendants, Quintile developed a lengthy history of discipline. She was repeatedly tardy, failed to call off in the manner required by the parties' collective bargaining agreement, lied during an internal investigation, and had improper contact with an inmate. Defendants also gained a significant amount of knowledge regarding Quintile's personal life during her time at MCSO, but the information was not sought out by Defendants. It appears from the record that Quintile underwent a contentious divorce during her employment that resulted in a protection order against her then-husband, Michael Quintile. It seems that during her employment, Michael had a penchant for contacting her supervisors and making various accusations against her. These accusations sometimes occurred through face-to-face meetings with Sheriff Hassinger and other times were left on the voicemail of Quintile's supervisors. Invariably, Quintile was informed of the content of these accusations and she explained their false nature.

Additionally, Quintile admittedly had romantic relationships with two co-workers during her time of employment. Defendants became aware of these relationships and as a result, they

altered Quintile's shifts so that she was not supervised by the individual with whom she was having a relationship.

Quintile was involved with several issues regarding her conduct with inmates. On one occasion, she was accused of discussing personal relationships with a female inmate in violation of jail policies. Quintile was also alleged to have had improper contact with inmate Richard Clark after he was released. Still another inmate bragged that he had slept with Quintile. An investigation followed and the inmate denied the relationship, stating that he had made up the story to impress another inmate. Quintile alleges that during the interrogation of this inmate, Defendant Baker stated that Quintile had a "nice ass" and that he "would like to f*ck her."

Based upon these and other assorted facts, Quintile filed her complaint on August 8, 2007, alleging eleven different causes of action. Quintile asserted that she was subjected to gender discrimination, sexual harassment, a hostile work environment, disability discrimination, interference with her FMLA rights, retaliation, wrongful discharge, defamation, invasion of privacy, and the intentional infliction of emotional distress. Quintile also claimed that Defendants had breached the collective bargaining agreement that governed her employment. On March 17, 2008, Defendants moved for summary judgment. On May 24, 2008, Quintile responded in opposition.

## II. Legal Standard

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The initial burden of showing the absence of any "genuine issues" belongs to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed.R. Civ.P. 56(c)).

3

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. (quoting former Fed.R. Civ.P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens. *Id*. at 252. Moreover, the Court must view a summary judgment motion "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995). Moreover, Fed.R. Civ.P. 56(e)(2) states as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Accordingly, summary judgment analysis asks whether a trial is necessary and therefore is appropriate when there are no genuine issues of fact. *Anderson,* 477 U.S. at 250.

### III. Legal Analysis

#### A. Gender Discrimination

The Sixth Circuit has detailed the elements of a prima facie case of gender discrimination as follows:

4

> Because she has no direct evidence of discrimination, [Quintile] must show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. In her attempt to satisfy the fourth element, [Quintile] alleges that similarly situated male employees were treated more favorably than she was. [Quintile] may make this comparison only if the male employees that she has identified are similarly situated in all respects to her.

*Peltier v. U.S.*, 388 F.3d 984, 987 (6th Cir. 2004) (citations and quotations omitted). "[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citing *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531 (S.D.N.Y. 1986); *Lanear v. Safeway Grocery*, 843 F.2d 298 (8th Cir. 1988)).

Quintile has failed to identify any similarly situated persons under the guidelines set forth by the Sixth Circuit. First, Quintile concedes that her lengthy history of discipline was compiled under numerous supervisors. When attempting to compare her discipline, however, she often fails to state the supervisor that handed down the discipline. More importantly, when identifying male corrections officers that allegedly engaged in the same conduct but received lesser punishment, Quintile omits a key piece of information: the disciplinary history of the male officers.

To be clear, Quintile's discipline history is lengthy. For clarity, the Court will detail that history to demonstrate the importance of Quintile's failure to provide any discipline history on the alleged similarly situated male officers.

On April 13, 2001, Quintile received a verbal warning for failing to attend training on the prior day. On January 12, 2002, Quintile received a written reprimand for bringing contraband, cuticle clippers, into the jail. On June 13, 2002, Quintile received a written reprimand for being tardy four times between February 8 and June 6, 2002. On October 24, 2002, Quintile was suspended for three days as a result of being convicted of driving under the influence. On January 17, 2003, Quintile was given another written reprimand for being tardy. On October 1, 2003, she was verbally warned for the patterned use of sick leave. On November 7, 2003, Quintile was suspended for ten days for being late on November 4. Quintile appealed the matter through her union representative, and the suspension was reduced to five days.

Quintile's discipline then continued as follows. On February 19, 2004, she was suspended for thirty days for giving false testimony during an internal investigation. A settlement agreement reduced her suspension to six days. On March 24, 2005, Quintile was verbally warned for failing to call off work in a timely manner. On August 16, 2005, Quintile received a second thirty day suspension, this one for her continued tardiness. The suspension, however, was ultimately reduced to a written reprimand. On April 7, 2006, Quintile received a seven-day suspension for inappropriate contact with an inmate, namely discussing personal relationships with a female inmate. On May 18, 2006, Quintile was given a notice of termination letter based on two violations of the attendance policy that occurred on May 6 and May 9. Defendants did not terminate Quintile at this time. Instead, the parties entered into a Last Chance Agreement. In lieu of termination, Quintile received a twenty-day suspension. In addition, the Agreement provided that Quintile would be terminated for any further violations of the attendance policy. On February 5, 2007, Quintile was terminated for failing to call off in a timely manner on January 28, 2007.

6

In an effort to meet her burden, Quintile has highlighted specific instances where male corrections officers engaged in similar conduct but were punished in a different manner. To meet her burden, however, Quintile must demonstrate that similar situated persons were treated differently "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. As detailed above, Quintile's lengthy history of discipline is a more than adequate basis for distinguishing the Defendants' treatment of others that committed similar infractions. Without providing the discipline history of the persons to whom she seeks to compare herself, Quintile cannot meet her prima facie case of gender discrimination. Consequently, summary judgment in favor of the Defendants is appropriate on this claim.

**B. Sexual Harassment and Hostile Work Environment**

A plaintiff may establish a violation of Title VII by demonstrating that discrimination based on sex created a hostile or abusive working environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). To establish a sexually hostile environment claim, a plaintiff must provide sufficient evidence to show that (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) there is a basis for employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (setting forth the analogous elements of racial discrimination).

A hostile work environment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that are sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift Sys.,*

7

*Inc.*, 510 U.S. 17, 21 (1993).[1] The conduct complained of must be both severe and pervasive enough to create an environment that a reasonable person would find hostile or abusive and the plaintiff must subjectively regard that environment as abusive. *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000). In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment, the court must consider the totality of the circumstances. *Williams*, 187 F.3d at 562. Appropriate factors for a court to consider include the frequency of the alleged discriminatory conduct; its severity; whether the conduct is physically threatening or humiliating or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Bowman*, 220 F.3d at 463. The conduct must be sufficiently extreme to amount to a change in the terms and conditions of employment. *Lovelace v. BP Prod. N. Am., Inc.*, 252 Fed. Appx. 33, 40 (6th Cir. 2007). "[M]ere utterance of an … epithet which engenders offensive feelings in a employee, does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (1993) (quoting *Meritor Savings Bank*, 477 U.S. at 67).

Quintile's claim of sexual harassment appears to focus on two incidents. First, another corrections officer, Jim Moon, attempted to create a relationship with Quintile. According to Quintile's testimony, Moon's fondness for her bordered on obsession. When Quintile notified her superiors of Moon's conduct, Moon was admonished. In addition, Moon was transferred from Quintile's shift to limit his ability to interact with her. Following this action by Defendants, Quintile did not complain of further actions taken by Moon.

---

[1] Ohio courts generally apply federal case law interpreting Title VII of the Civil Rights Act when analyzing violations of R.C. chapter 4112. *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civ. Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Accordingly, the Court's analysis will be dispositive of Quintile's state and federal claims.

In addition to her claim against Moon, Quintile also alleged that Lieutenant David Baker commented to an inmate that Quintile "had a nice ass" and that he "would like to f*ck her." Quintile admits that these remarks were never made directly to her. Furthermore, she has provided no evidence that these statements occurred on more than this one isolated occasion. While the Court does not condone such remarks, given their isolated nature and the fact that they were not made in Quintile's presence, they do not give rise to a hostile work environment.

The remainder of Quintile's evidence in support of this claim is best described as a hodge-podge of vague statements. Quintile appears to allege that other officers discussed her private relationships. She does not identify any specific statements that were made, nor does she attribute the general statements to a particular co-worker. Finally, she does not identify the general time period these statements occurred or state the frequency in which the statements were made.

Based upon the totality of the circumstances, the conduct complained of by Quintile does not approach the quantum necessary to amount to a change in the conditions of her employment. Quintile, therefore, has not demonstrated that a genuine issue of material remains on her sexual harassment and hostile work environment claims. Defendants are entitled to judgment on these claims.

### C. Disability Discrimination

In order to establish a prima facie case of discrimination based upon disability, Quintile must demonstrate that: (1) she is disabled; (2) she is otherwise qualified for the job, with or without a reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of the disability at the time of the employment decision;

9

and (5) either the position remained open or was filled by another employee. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996).

The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). During her employment, Quintile was diagnosed with an "adjustment disorder with mixed anxiety and depressed mood." Doc. 30-17 at 2. Her treating doctor indicated that Quintile "may need to be off on an intermittent basis." Doc. 30-17 at 2. Quintile has offered no argument, nor provided any facts to suggest that her diagnosis fits within the ADA's definition of a disability. In fact, Quintile was nearly immediately released back to work without restriction following her diagnosis. Her doctor simply indicated that if her stress level became too high that Quintile may need to take leave. There is nothing in the record to suggest that Quintile's disorder substantially limited any of her major life activities. Consequently, Quintile has failed to demonstrate that she was disabled within the meaning provided by the ADA. Her disability discrimination claim fails as a matter of law.

**D. FMLA Claim**

"Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). Accordingly,

> [i]f the plaintiff satisfies her prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination.

*Id*. (citations omitted).

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show "(1) that she engaged in conduct protected by the Act, (2) that the defendant was aware of this exercise of protected rights, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005). "Accordingly, at the *prima facie* stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). Standing alone, however, temporal proximity between the protected activity and the adverse employment action is insufficient to establish a prima facie case. *See Parnell v. West*, 114 F.3d 1188 (6th Cir. 1997) (table decision).

It is not possible to determine under what theory Quintile premises liability as it relates to the FMLA. In her brief in opposition, Quintile asserts that she was never given notice of her FMLA rights. Quintile also notes that it is unlawful to use FMLA leave when computing excessive absenteeism. Quintiles assertions, however, do not support any cognizable cause of action.

With respect to her allegation that she was not presented with information regarding her FMLA rights, Quintile's assertion lacks evidence to support it. During her employment, Quintile was repeatedly approved for FMLA leave, evidencing her knowledge of her rights under the FMLA. Furthermore, the uncontradicted evidence demonstrates that FMLA notices were posted in the break room used by the corrections officers and that electronic versions were provided to

11

all employees upon hire.  Finally, even if these notices were not viewed by Quintile, this failure does not provide a basis for an independent cause of action.

With respect to computing excessive absenteeism, Quintile has provided no evidence that her FMLA leave was ever used in such a manner.  As such, the case law cited by Quintile is inapplicable.

The Court finds this claim to be baseless.  Quintile was never denied FMLA leave during the course of her employment.  Moreover, there is no temporal connection between Quintile's termination and her previously requested FMLA leave.  In short, there is no evidence of any kind to support any type of claim related to the FMLA.  Defendants are entitled to judgment on this claim.

   **E.  Retaliation**

A plaintiff alleging retaliatory discharge must prove the following: "(1) that she engaged in protected activity; (2) that she was the subject of adverse employment action; and (3) that a causal link existed between the protected activity and the adverse action." *Chandler v. Empire Chem., Inc.,* 650 N.E.2d 950, 954 (Ohio Ct. App. 1994) (citing *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984)).  Federal law has adopted the *McDonnell Douglas* burden-shifting framework in retaliation cases, in which the plaintiff must first make out a prima facie case of discrimination.  *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). The burden then shifts to the defendant to give a legitimate, non-discriminatory explanation for its actions regarding the plaintiff. *Id*. If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered explanation is pretextual. *Id*.

Quintile appears to argue that she engaged in protected activity when she complained to Sheriff Hassinger about the unfair treatment she received from Dean Lesak. Quintile does not place a date on the occasions that she complained of Lesak's actions. Assuming, *arguendo*, that Quintile's minimal evidence meets her prima facie case, Defendants have offered a legitimate, non-discriminatory reason for her termination. Defendants offered that Quintile was terminated for violating the Last Chance Agreement and the attendance policy set forth in the collective bargaining agreement. Quintile does not dispute these facts. As a result, Defendants have met their burden of providing a legitimate reason for Quintile's termination. In response, Quintile has offered no evidence that the reasons given for her employment were pretextual. Defendants, therefore, are entitled to judgment on the claim of retaliation.

### F. Intentional Infliction of Emotional Distress ("IIED")

Under Ohio law, a plaintiff claiming intentional infliction of emotional distress must show that

> (1) the defendant intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it.

*Ekunsumi v. Cincinnati Restoration, Inc.*, 698 N.E.2d 503, 506 (Ohio Ct. App. 1997). *See also*, *Yeager v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio 1983) (overruled on other grounds).

Like her complaint in general, Quintile's IIED claim has no focus. She does not identify any discrete activities that were outrageous and extreme. Instead, Quintile reiterates that her personal relationships with inmates were investigated by Defendants and that she was "forced into signing settlement agreements and Last Chance Agreements." Doc. 30 at 27. As noted

13

above, the Court does not condone the alleged statement made by Lieutenant Baker. However, Quintile has identified no action or statement that could be considered beyond all possible bounds of decency. Her IIED claim fails as a matter of law.

### G. Breach of Contract

An individual employee may bring a suit against his employer for breach of a collective bargaining agreement ("CBA"). *See Smith v. Evening News Ass'n*, 371 U.S. 195 (1962). However, the employee is first required to exhaust any grievance or arbitration remedies available to him. *Id.* at 196, fn. 1 (collecting cases). Quintile has never grieved nor arbitrated the alleged violations of the CBA, despite arbitration being mandatory under the CBA. Consequently, she may not raise those claims for the first time in this Court. Defendants are entitled to judgment on this claim.

### H. Wrongful Termination

In her claim for wrongful termination, Quintile effectively argues that her termination was wrongful because of the discriminatory practices she alleged in her other causes of action. Having found no merit in those claims, the Court similarly finds no merit in Quintile's contention that she was wrongfully terminated.

### I. Defamation

Defamation is a false publication causing injury to a person's reputation, including affecting that person adversely in a trade or business. *Snyder v. Ag Trucking, Inc*., 57 F.3d 484, 489 (6th Cir. 1995). "To establish a prima facie case, plaintiff must show a publication to a third person for which defendant is responsible, the recipient's understanding of the defamatory meaning, and its actionable character." *Id.* (citation and quotation omitted.)

14

In her brief in opposition, Quintile states as follows: "Defendants falsely alleged that Quintile was sleeping with inmates. Defendants further spread rumors about Plaintiff's actual mental status and what Defendants perceived about her mental status." Quintile does not allege which Defendant made these statements, nor does she identify when the statements were made. Assuming that Quintile has demonstrated that false statements were made by named Defendants, her claim still must fail.

Initially, the Court notes that several of the statements that Quintile may be relying on are admittedly not false. At one point, Quintile alleged that she was defamed when other officers indicated to her that she was fired because others believed "she was sleeping around" with co-workers. During her deposition, Quintile admitted to having had sexual relationships with several co-workers. As a result, these alleged statements, even if attributed somehow to Defendants, cannot form the basis of a defamation claim.

Additionally, under Ohio law the doctrine of qualified privilege provides that statements made in good faith on a matter of common interest between an employer and an employee, or between two employees, concerning a third employee are protected in an action for defamation. *Evely v. Carlon Co*., 447 N.E.2d 1290, 1292 (Ohio 1983); *Hanley v. Riverside Methodist Hosp*., 603 N.E.2d 1126, 1131 (Ohio Ct. App. 1991). If the requirements for the qualified privilege are established, then the burden falls on the plaintiff to show by clear and convincing evidence that the statements were made with actual malice, i.e., that the statements were made with knowledge or reckless disregard for their truth or falsity. *Evely*, 447 N.E.2d at 1292; *Jacobs v. Frank*, 573 N.E.2d 609, paragraph two of the syllabus (Ohio 1991).

It is undisputed that the alleged defamatory statements were made between employees or between an employer and an employee. Moreover, Defendants presented evidence that

15

investigations over allegations that Quintile slept with an inmate were required because such an action would be grounds for termination.  Furthermore, it is also undisputed that Quintile's personal life directly intersected with her work life.  Her ex-husband appeared at her place of work on numerous occasions making outlandish accusations against her.  Consequently, at that point, her personal life became a legitimate interest of her employer.  The Court, therefore, finds that any alleged defamatory statements were protected by a qualified privilege.

Quintile has offered no evidence that the statements made by Defendants were made with a reckless disregard for the truth.  As noted above, several of the statements Quintile has relied on during this litigation were shown to be true.  Consequently, Quintile's claim for defamation fails.

**J.  Invasion of Privacy**

To establish a claim for invasion of privacy by publication of private facts, a plaintiff must prove five elements:

> (1) There must be publicity; the disclosure of a public nature, not private. "Publicity" means communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to 'publication' as that term of art is used in connection with liability for defamation as meaning any communication by the defendant to a third person.
>
> (2) The facts disclosed must be those concerning the private life of an individual, not his public life.…
>
> (3) The matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.
>
> (4) The publication must have been made intentionally, not negligently.
>
> (5) The matter publicized must not be a legitimate concern to the public.

*Killilea v. Sears, Roebuck & Co*., 499 N.E.2d 1291, 1294-95 (Ohio Ct. App. 1985).

Quintile's claim of invasion of privacy fails as a matter of law.  Quintile cannot satisfy the publication requirement.  As even she concedes, the alleged invasion consisted of other employees learning details of her private life.  Her personal life was never disclosed to "the public at large" as is required to support this cause of action.  To permit this type of publication to support an invasion of privacy claim would eviscerate the qualified privilege afforded to statements made in a place of employment.  Defendants, therefore, are entitled to judgment on this final claim.

### IV.  Conclusion

Based upon the reasons stated herein, Defendants' motion for summary judgment is GRANTED.  Quintile's complaint is DISMISSED.  The Court certifies, pursuant to 28 U.S.C. §1915(a)(3), that an appeal from this decision could not be taken in good faith.

IT IS SO ORDERED.


DATED: June 17, 2008                     __/s/ John R. Adams_____
                                         JUDGE JOHN R. ADAMS